UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| FRANKLIN B. WOOD, JR., | : | Case No. 3:15-cv-212 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Chief Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.     Introduction

Plaintiff Franklin B. Wood, Jr. applied for a period of disability, Disability Insurance Benefits, and Supplemental Security Income on July 31, 2012.  He asserted that he could no longer work a substantial paid job as of July 6, 2012 due to bipolar disorder, psychotic tendencies, paranoia, schizophrenia, and anxiety attacks.  His applications, medical records, and other evidence proceeded to a hearing before Administrative Law Judge (ALJ) David A. Redmond who later issued a written decision. The result of his decision was the denial of Plaintiff's application based on his central conclusion that Plaintiff was not under a "disability" as defined in the Social Security

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Act.  Plaintiff brings the present case challenging ALJ Redmond's non-disability decision.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Redmond's non-disability decision.

## II.   Background

Plaintiff asserts that he has been under a "disability" since July 6, 2012.  He protectively filed his application for benefits on July 31, 2012.  He was fifty years old at the time and was therefore considered "an individual closely approaching advanced age" under Social Security Regulations.  He has at least a high school education.  His past relevant employment includes work as a printing-machine operator, lawn and garden material handler, and a vacuum-cleaner repairer.  His significant health problems include bipolar disorder, psychotic tendencies, paranoia, schizophrenia, and anxiety attacks.

### A.   Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Redmond that he last worked as a mechanic in the summer of 2012. (Doc. #6, *PageID* #107).  He stopped working after he had a disagreement with his boss.  *Id*.  He explained, "I said I can't do this no more, you know.  I'm a nervous wreck.  Instead of verbally assaulting him and everything else, I

2

had to walk away and calm down…." *Id*. The "biggest problem" affecting his ability to work full-time is "a problem dealing with people." *Id*. at 108. He primarily has issues with supervisors. *Id*. at 113. He has limited interaction with coworkers because he "keeps to himself" and "they keep their distance." *Id*. Over the past fifteen years, he has had approximately sixteen jobs. *Id*. at 112. He was let go from one job because he did not "get along with [them] about trucks or [their] people." *Id*. He left another job because he "was such a nervous wreck..." and he "couldn't even focus to do my job." *Id*.

His "mental emotional problems" started when he suffered a "nervous breakdown" in 1995 or 1996. *Id*. at 108. He "can't keep a relationship with anyone, because I argue with them." *Id*. at 108-09. He has tried various psychotropic medications, but the medication either makes him physically sick or lethargic. *Id*. at 109. He has also attended anger management classes. *Id*. at 111.

Plaintiff has lived with his parents since 2009. *Id*. at 106. He has a driver's license and has no difficulty driving. *Id.* He helps out with household chores, such as vacuuming and taking out the trash. *Id*. at 109. He also likes to work on cars with his father, but they "argue like crazy" when working together. *Id*. He spends time in his parent's garage either waxing the car or lifting weights. *Id*. at 109-10. During a typical day, he gets out of bed between 6 a.m. and 8 a.m., watches the news, and gets his father's newspaper. *Id*. at 110. He does laundry if needed, exercises "a little bit," and then goes "for a ride somewhere, to the store or to the mall or anywhere." *Id.* He also spends time with his grandchildren. *Id*. at 110-11.

3

Plaintiff does not have friends that he spends time with. *Id*. at 109. He tries to go to stores to walk around and "be around people a little bit instead of hibernating in a cave or something like I'm a convict…." *Id*. at 110. However, he sometimes runs into conflicts with people when shopping. *Id*. at 114. He also goes out "every now and then" to listen to people sing karaoke, "but I can't be around a lot of people…, and I just get nervous and I get jittery…." *Id*. at 110. He generally does not interact with people at karaoke. *Id*. at 114.

### B.     Medical Evidence

Plaintiff began treatment with Dr. Emanuel Papadakis, a psychologist at the Veterans Affairs Medical Center, in September 2012. *Id*. at 380. He met with Dr. Papadakis approximately every month for one hour. *Id*. at 361-90. He was treated for depression, bipolar disorder, and unemployability. *Id*. at 380.

On April 8, 2013, Dr. Papadakis completed a mental impairment questionnaire. *Id*. at 435-38. He indicated that Plaintiff suffers from bipolar disorder and his symptoms include: psychomotor agitation or retardation, feelings of guilt or worthlessness, hyperactivity, sleep disturbance, decreased energy, difficulty concentrating or thinking, pressure of speech, inflated self-esteem, easily distracted, vigilance and scanning, recurrent obsessions, and recurrent recollection of a traumatic experience which causes marked distress. *Id*. at 435. Dr. Papadakis anticipated he would be absent from work three to four days per month. *Id*.

4

Dr. Papadakis opined that Plaintiff was extremely limited in his ability to accept instruction and respond appropriately to criticism from supervisors, and he was markedly limited in his abilities to complete a normal workday and workweek without interruptions from psychologically-based symptoms; maintain attention and concentration for extended periods; perform activities without a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal work stress. *Id*. at 436-37.  Dr. Papadakis also indicated that he had a marked limitation in activities of daily living. *Id*. at 437.  Dr. Papadakis noted that his work limitations began two or more years ago. *Id*.

Plaintiff was also treated by Dr. Jeffrey Guina, a psychiatrist at the Veterans Affairs Medical Center, beginning in September 2012. *Id*. at 382.  He met with Dr. Guina approximately once per month. *Id*.  Dr. Guina originally diagnosed Plaintiff with bipolar disorder and found he had borderline personality disorder traits. *Id*. at 384.  Dr. Guina prescribed him Depakote, but he stopped taking it due to negative side effects. *Id*. at 377, 383.  In October 2012, Dr. Guina opined,

> Patient is unlikely to have Bipolar DO because of chronic pervasive (rather than episodic) symptoms (sleep changes, restlessness, irritability, mood swings), which are better described by Axis 2. Patient met criteria for Borderline Personality DO based on a pervasive pattern of impulsivity, rage reactions, chronic feelings of emptiness, unstable relationships, and unstable sense of self.

*Id*. at 378.  In December 2012, Dr. Guina prescribed Depakote and Atarax. *Id*. at 466.  Plaintiff reported to Dr. Guina that the medications "really help." *Id*. at 444.

5

Dr. Irma Johnston, a non-examining State agency psychologist, reviewed Plaintiff's records and concluded on August 24, 2012 that he was not under a disability. *Id*. at 142-52. She opined he was moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavior extremes. *Id*. at 149. On November 9, 2012, Dr. Cynthia Waggoner, another non-examining State agency psychologist, reviewed Plaintiff's records and agreed with Dr. Johnston's findings. *Id*. at 166-75.

### III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Redmond to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[2] He reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since July 6, 2012.

Step 2: He has the severe impairment of bipolar disorder.

Step 3: He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: His residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted of a "full range of work at all exertional levels , including heavy/very heavy work. Giving the claimant the full benefit of [sic] with regard to his allegations and subjective complaints, he is limited to unskilled work featuring no more than occasional personal contacts and no production quotas."

Step 4: He is unable to perform any of his past relevant work.

Step 5: He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 89-97). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 97.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

## V. Discussion

Plaintiff contends that the ALJ's residual functional capacity assessment is not based on substantial evidence because the ALJ erred in finding that Plaintiff was only moderately limited in social functioning. Plaintiff also asserts that the ALJ erred in finding that Plaintiff's treating psychologist's opinion was entitled to "little weight." The Commissioner maintains that substantial evidence supports both the ALJ's residual functional capacity assessment and the ALJ's finding that Plaintiff's treating psychologist's opinion was entitled to "little weight."

### A. Dr. Papadakis' Opinion

The ALJ concluded that the opinion of Plaintiff's treating psychologist, Dr. Papadakis, was entitled to "little weight." Social Security Regulations recognize several different categories of medical sources: treating physicians, nontreating yet examining physicians, and nontreating yet record-reviewing physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Id.* (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (d) (eff. April 1, 2012)). To effect this hierarchy, the Regulations adopt the treating physician rule. The rule is straightforward:

9

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Id*. (citation omitted); *see Gentry*, 741 F.3d at 723. If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

The ALJ determined that Dr. Papadakis' opinion was not entitled to controlling or deferential weight and, instead, placed "little weight" on his opinions. The ALJ explained,

> The medical source statement is inconsistent with the overall treatment records, which showed Global Assessment of Functioning (GAF) scores primarily of 55, indicative of moderate symptoms, moderate impairment in

10

>functioning, or both. There is no evidence that the claimant required psychiatric hospitalization. He was only seen for treatment at roughly monthly intervals. The questionnaire completed by the psychologist is also internally inconsistent: he initially rated the claimant as having a "marked" limitation in maintaining attention[,] concentration, persistence, or pace, but later reported only a "moderate" limitation in this area. The psychologist reported that the claimant had a "marked" restriction in activities of daily living, which is inconsistent with the claimant's own testimony and report regarding his ADLs. He reported that the onset of claimant's work limitation had occurred two or more years ago, but earlier reported that he had only seen the claimant for six month[s].

(Doc. #6, *PageID* #94) (internal citations omitted).

The ALJ erred in relying on Plaintiff's GAF scores to find that Dr. Papadakis' opinion was inconsistent with overall treatment records. Plaintiff is correct that there are numerous GAF scores below 55, but the Commissioner is also correct that there are many scores at or above 55. Specifically, Dr. Papadakis assigned GAF scores between 45 and 50, and Dr. Guina only assigned GAF scores of 55. *Id.* at 372-84, 403-05, 446-84. Nevertheless, "the Commissioner 'has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.,* 211 Fed. App'x 411, 415 (6th Cir. 2006) (quoting *Wind v. Barnhart,* No. 04–16371, 2005 WL 1317040, at *6 n. 5, 133 Fed. Appx. 684 (11th Cir. June 2, 2005); and 65 Fed. Reg. 50746, 50764–65 (Aug. 21, 2000)). Further, the fifth and most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) no longer uses the GAF scale, in part due to "its lack of conceptual clarity (*i.e.,*

11

including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." Liza H. Gold, *DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0,* 42 J. Am. Acad. Psychiatry & Law 173, 174 (2014) (footnote omitted) (*available at* http://www.jaapl.org.  Search by article title).  The recent rejection of the GAF scale by the psychiatric professionals who created it and its lack of direct correlation with the requirements of the Commissioner's mental disorders listings cast too dark a shadow over its use as a reason to reject a treating psychologist's opinion.

The ALJ accurately observed that there is no evidence indicating Plaintiff required psychiatric hospitalization and that he attended treatment with Dr. Papadakis approximately once per month.  However, the ALJ fails to recognize that he participated in both group counseling and music therapy, and he also attended treatment with Dr. Guina approximately once per month.  (Doc. #6, *PageID* #s 350-496).  Additionally, although Dr. Guina was his treating psychiatrist, the ALJ completely overlooks or ignores all of his treatment other than mentioning that he has a psychiatrist that prescribes medication.  The ALJ did not assign weight to Dr. Guina's opinions and did not provide reasons.  This constitutes error under Social Security Regulations and case law.  *See* 20 C.F.R. § 404.1527; *Bowen,*  478 F.3d at 747 ("[T]he ALJ's complete failure to mention [plaintiff's treating psychologist] plainly violated the terms of § 1527(d)(2)."); *Blakley,* 581 F.3d at 408 (citing Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *4-5).

In addition, the ALJ erred by failing to acknowledge that Dr. Papadakis' opinion is generally consistent with Dr. Guina's treatment records. Both Dr. Papadakis and Dr. Guina began treating Plaintiff in September 2012, and both comment extensively on Plaintiff's irritability and inability to maintain relationships. (Doc. #6, *PageID* #s 380-86). Dr. Guina noted Plaintiff was "easily irritable often with rage reactions." *Id*. at 382. He also opined Plaintiff "met criteria for Borderline Personality DO based on a pervasive pattern of impulsivity, affective instability, rage reactions, chronic feelings of emptiness, unstable relationships, unstable sense of self, and transient stress-related paranoia." *Id*. at 378, 384, 403, 468. Similarly, Dr. Papadakis indicates Plaintiff reported "problems with anger, severe depression, irritability, chronic pain, isolation, [and] living with his parents." *Id*. at 371. Dr. Papadakis also noted that he reported "a great deal of irritability, anger, has reduced the social activity that he has in order to avoid angry outbursts and getting into trouble in public places." *Id*. at 405. Therefore, there is not substantial evidence to support the ALJ's statement that Dr. Papadakis' opinion is inconsistent with Plaintiff's overall treatment records.

The ALJ next asserts that Dr. Papadakis' opinion is entitled to less weight because the questionnaire completed by Dr. Papadakis is internally inconsistent. *Id*. at 94. Plaintiff correctly observed that Dr. Papadakis indicated he has a marked limitation in maintaining attention and concentration *for extended periods* and a moderate limitation in maintaining concentration, persistence, or pace. (Doc. #8, *PageID* #517). This is a

13

meaningful distinction, and the Commissioner acknowledged that there was no internal inconsistency in Dr. Papadakis' opinion. (Doc. #11, *PageID* #540).

The ALJ then contends Dr. Papadakis' opinion that Plaintiff has a marked limitation in activities of daily living is inconsistent with Plaintiff's own testimony. Social Security Regulations explain,

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking…. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. … We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. § 404, Subpt. P, App. 1, 12.00(C)(1).

The ALJ observed that Plaintiff testified that he helps out with household chores, including vacuuming and taking out the trash. (Doc. #6, *PageID* #92). Plaintiff also works on cars with his father, goes to the store, and goes to listen to people sing karaoke. *Id*. at 109-10. The ALJ asserts that these activities are inconsistent with a marked limitation in activities of daily living. However, the ALJ disregarded the interruptions and distractions that occur when Plaintiff's activities involve interaction with others. For example, he works on cars with his father, but they "argue like crazy" to the extent that his father will not come out to talk to him. *Id.* at 109. When he goes shopping, he runs into conflict with people such as the cashier in the self-checkout. *Id.* at 114. When he

goes to listen to karaoke, he sits by himself and leaves after thirty to forty-five minutes. *Id.* at 114.  Thus, Dr. Papadakis' opinion that Plaintiff has a marked limitation in activities of daily living is consistent with the restrictions he has with activities that involve interacting with others.

Finally, the ALJ asserts that Dr. Papadakis reported that Plaintiff's work limitations began two or more years ago when he had only been treating him for six months.  Dr. Papadakis began treating him on September 26, 2012, and he completed the mental impairment questionnaire on April 8, 2013.  Although the ALJ's observation is correct, it should also be noted that Plaintiff alleges that his disability began on July 6, 2012, less than two months before he began treatment with Dr. Papadakis.

In contrast to the "little weight" the ALJ assigned to Plaintiff's treating psychologist, he concluded that the opinions of State agency reviewing psychologists, Dr. Irma Johnston and Dr. Cynthia Waggoner, were entitled to "some weight."  The ALJ provides no explanation for the weight he assigned to their opinions.  This constitutes error because "[u]nless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant…." 20 CFR § 404.1527(e)(2)(ii).  In addition, the ALJ erred by failing to apply the same level of scrutiny to reviewing psychologists' opinions as he applied to treating source's opinion.  *See Gayheart,* 710 F.3d at 379  (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (July 2, 1996)) ("A more rigorous scrutiny of the treating-source opinion than the

nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). The ALJ notes that "[a]dditional medical evidence received at the hearing level supports the need for a modification of the recommended restrictions." (Doc. #6, *PageID* #93) (citing Soc. Sec. R. 96-6p). However, he does not acknowledge that Dr. Johnston reviewed Plaintiff's records prior to any treatment by Dr. Papadakis or Dr. Guina, and Dr. Waggoner only reviewed two months of Plaintiff's records from Dr. Papadakis and Dr. Guina.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

**B.     Remand is Warranted**

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's mental residual-functional-capacity assessment is unwarranted.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35 F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of § 405(g) due to problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether he was under a benefits-qualifying disability under the applicable five step sequential evaluation procedure.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Franklin B. Wood was under a "disability" within the meaning of the Social Security Act;

  3.  This matter be remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

  4.  The case be terminated on the Court's docket.


Date: July 18, 2016          *s/Sharon L. Ovington*
                    Sharon L. Ovington
                    Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).